IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

MARGARET WELCH,                    )
                                   )
            Plaintiff,             )
                                   )
      v.                           )  Case No. 06-4227-CV-C-REL-SSA
                                   )
MICHAEL ASTRUE, Commissioner       )
of Social Security,                )
                                   )
            Defendant.             )

### ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Margaret Welch seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Title II of the Social Security Act ("the Act"). Plaintiff argues that (1) the ALJ erred in failing to give controlling weight to the opinions of plaintiff's treating physicians, and (2) the ALJ's residual functional capacity assessment is not based on the evidence. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

### I.   BACKGROUND

On December 16, 2004, plaintiff applied for a period of disability and disability insurance benefits alleging that she had been disabled since October 17, 2004. Plaintiff's disability stems from fibromyalgia, depression with anxiety, and possible

spinal stenosis.  Plaintiff's application was denied on February 14, 2005.  On July 11, 2005, a hearing was held before an Administrative Law Judge.  On October 13, 2005, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On July 31, 2006, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts

2

v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo.

3

2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Com-missioner.

5. Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

4

## IV. THE RECORD

The record consists of the testimony of plaintiff and documentary evidence admitted at the hearing.

### A. EARNINGS RECORD

The record establishes the plaintiff earned the following income from 1981 through 2004:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1981 | $ 1,427.71 | 1993 | $     0.00 |
| 1982 | 243.59 | 1994 | 0.00 |
| 1983 | 0.00 | 1995 | 3,631.64 |
| 1984 | 0.00 | 1996 | 6,146.91 |
| 1985 | 0.00 | 1997 | 10,964.53 |
| 1986 | 42.21 | 1998 | 7,718.35 |
| 1987 | 52.76 | 1999 | 10,265.31 |
| 1988 | 4,669.71 | 2000 | 12,100.67 |
| 1989 | 1,690.02 | 2001 | 5,760.30 |
| 1990 | 0.00 | 2002 | 8,401.95 |
| 1991 | 0.00 | 2003 | 15,054.62 |
| 1992 | 0.00 | 2004 | 11,899.03 |

(Tr. at 49, 54, 56).

### B. SUMMARY OF MEDICAL RECORDS

On March 23, 1998, plaintiff had x-rays of her lumbar spine which were normal (Tr. at 195).

On April 16, 1998, plaintiff was seen by a physical therapist for an initial evaluation of low back and hip pain (Tr. at 186-193). Plaintiff reported that she slid in water on

5

December 27, 1997, while working for McDonald's and tripped, then when she returned to work on March 13, 1998, she fell over a computer cord while working, adding to her injury.  Plaintiff was to attend physical therapy three times per week for two weeks.

Plaintiff went to physical therapy on April 20, 1998, and reported that her pain medication was not working.  She came back to physical therapy on April 22 and reported soreness.  She returned on April 24 and reported soreness in her hips.  She returned on April 27 and complained of soreness, but said she was able to tolerate work longer.  On April 29, 1998, plaintiff did not show up for physical therapy and did not call.  Plaintiff failed to contact her physical therapist after failing to show.

On July 6, 1998, plaintiff was seen again, with a plan to attend physical therapy three times a week for three weeks.  Her physical therapist discussed with her the importance of increasing her abdominal strength as this appeared to be causing postural problems.  There is no record that plaintiff ever returned to physical therapy after that date.  On July 8, 1998, plaintiff failed to show up for her appointment and did not call.  On July 10, she called to cancel.  On July 13, she did not show up and did not call.  On September 2, 1998, the physical therapist made a note that plaintiff had been seen for the initial evaluation only.

6

On April 28, 2000, plaintiff saw Keith Ratcliff, M.D., in the emergency department at St. John's Mercy Hospital (Tr. at 144-146). Plaintiff complained that she slipped on the floor at McDonald's while working and fell, striking her left arm and shoulder. Plaintiff was given Tylenol 3 (with codeine, a narcotic analgesic), and reported that helped considerably with her pain. Plaintiff had x-rays of her shoulder which showed no fracture or dislocation. She was assessed with left shoulder contusion and sprain. She was told to use a sling and not to use her left arm at work for three days. She was given a prescription for Ibuprofen 800 mg (over-the-counter Ibuprofen is 200 mg), and Tylenol 3 as needed for pain, with no refills.

On August 6, 2000, plaintiff saw Christopher Jackson, D.O., at the St. John's Mercy Hospital emergency room due to back pain (Tr. at 142-143). Plaintiff reported a long history of back pain, said she had had CTs and MRIs and was told there is nothing surgically that can be done. "She [has] had problems for many years. It has increased over the last three to four days other than she had just kind of over done it. . . . She just started Prozac[1] on Tuesday. She had a complete physical and was doing pretty good at that time. Really did not mention that her back was aching to her doctor but it has gotten worse since then."

---

[1] A selective serotonin reuptake inhibitor used to treat depression.

7

Dr. Jackson noted that plaintiff was smoking a pack of cigarettes per day. She said she was an occasional alcohol user. She was working for Camp Moval in Chesterfield and was living with her children. On exam plaintiff's joints were not tender, she ambulated without any difficulty, she had no point tenderness, no sign of diskitis, no signs of neurovascular emergency. She was given Morphine (a narcotic analgesic) intramuscularly and Ibuprofen. She was assessed with back pain and given a prescription for Ibuprofen 800 mg, Vicodin ES[2], and Flexeril (a muscle relaxer), and she was told to stop smoking.

On August 8, 2000, plaintiff saw Scott Crollard, M.D., at the St. John's Mercy Hospital emergency room (Tr. at 139-141). She complained of left pelvic area pain. She also complained of some low back pain on the left, worse when she moves about. Dr. Crollard observed minimal tenderness to the left c.v.a. area[3] of plaintiff's back. Plaintiff had a normal pelvic sonogram. Dr. Crollard gave plaintiff Toradol (a non-steroidal anti-inflammatory) intramuscularly which improved her pain. Morphine intramuscularly was required for further improvement of pain. Later plaintiff was given Rocephin (an antibiotic) intramuscularly for possible pelvic inflammatory disease. Dr.

---

[2]Vicodin ES is a mixture of Acetaminophen (Tylenol) and hydrocodone, a narcotic analgesic.

[3]Costovertebral angle, or the area over the kidneys.

8

Crollard gave plaintiff Doxycycline (an antibiotic) and Vicodin (a narcotic analgesic) for pain and told her also to take Aleve (over-the-counter Naproxen, a non-steroidal anti-inflammatory).

On November 20, 2000, plaintiff had an MRI of her lumbar spine which was normal (Tr. at 138).

On March 22, 2001, plaintiff went to the emergency room at St. John's Mercy Hospital due to left shoulder pain (Tr. at 135-137). She was trying to get a Frisbee off her roof when she stepped on a metal awning that caved in and she fell to the ground landing on her left shoulder. Plaintiff was in mild pain, her neck and back were nontender. Her shoulder x-ray was normal. Scott Crollard, M.D., diagnosed left shoulder sprain. He gave plaintiff Vicodin (a narcotic) for pain and told her to use a sling.

On April 17, 2002, plaintiff saw Dr. Noel Garcia in the emergency department at Missouri Baptist Hospital (Tr. at 181-184). Plaintiff complained of a laceration of her right foot due to stepping on glass. Plaintiff was given Vicodin.

On May 22, 2002, plaintiff saw Dr. Noel Garcia in the emergency department of Missouri Baptist Hospital (Tr. at 176-180). She complained of post-operative dental pain. She said she had a tooth pulled earlier that day and the pain medication (Tylenol 3) was not working. Plaintiff was given Demerol (a narcotic) and Phenergan (for nausea).

Case 2:06-cv-04227-REL   Document 24   Filed 09/06/07   Page 9 of 59

On July 17, 2002, plaintiff saw Sanjay Ghosh, M.D., complaining of lower back pain radiating into both hips and legs, numbness in her right leg and left hip, and being tired constantly (Tr. at 201). Plaintiff complained that her morning stiffness lasts one to two hours. She was working as a waitress, and she was smoking one pack of cigarettes per day. Under "Review of Symptoms", Dr. Ghosh marked "N" for numbness, tingling, back pain, and morning stiffness, among other things. Plaintiff had 1+ tenderness in the lumbar spine without muscle spasm. She had a nontender cervical spine, thoracic spine, ribs and pelvis; normal gait and station; 1+ tenderness without swelling in her left hip with normal range of motion; nontender shoulders, elbows, hips, ankles, wrists, MCPs, PIPs, MTPs and DIPs[4]. She had normal muscle strength and tone. Dr. Ghosh assessed low back pain and prescribed Ultram (a non-narcotic pain reliever).

On July 24, 2002, plaintiff failed to show for her appointment with Dr. Ghosh (Tr. at 201).

On August 15, 2002, plaintiff failed to show for her appointment with Dr. Ghosh (Tr. at 201).

On August 29, 2002, plaintiff saw Dr. Ghosh complaining of increased back pain radiating into both legs, and decreased sleep

---

[4]MCP's, PIP's, MTP's and DIP's refer to joints in the fingers and toes.

10

(Tr. at 201). Dr. Ghosh started plaintiff on an illegible medication as well as Amitriptyline (an antidepressant used to treat insomnia). The last line says, "MRI lumber spine -- refused to go for MRI".

On September 26, 2002, plaintiff saw Dr. Ghosh (Tr. at 201). The five-line handwritten note is almost completely illegible. The first line lists plaintiff's complaints, the second line states "14/18 tender points" but the remainder of the line is illegible. He assessed fibromyalgia[5], told plaintiff to continue taking Amitriptyline, and he referred her to a neurologist.

On December 29, 2002, plaintiff saw Dr. Mahmoud Salah in the emergency department at Missouri Baptist Hospital (Tr. at 170-174). She complained of low back pain radiating to her left hip for the past day. Plaintiff reported that she smokes one pack of cigarettes per day. Dr. Salah observed that plaintiff's mood and affect were normal. Dr. Salah assessed arthritis and low back strain and gave plaintiff Toradol (a non-steroidal anti-inflammatory) intramuscularly and gave her prescriptions for Percocet (a narcotic) and Flexeril (a muscle relaxer).

The next day, on December 30, 2002, plaintiff had x-rays of her left hip and a lumbar spine series, all of which were normal

_____

[5]The American College of Rheumatologists has defined fibromyalgia as the presence of (1) body or joint pain above and below the waist, and on the right and left side of the body, (2) axial pain (most often neck or low back pain), and (3) 11 out of 18possible tender points.

11

(Tr. at 175).

On February 4, 2003, plaintiff saw Dr. Mohammed Islam in the emergency department at Missouri Baptist Hospital (Tr. at 167-169). She complained of pain in her left hand. Plaintiff was offered Ibuprofen, and she stated, "I've got that." The doctor put on a splint, and gave plaintiff Motrin 600 mg and Darvocet (a narcotic).

On February 12, 2003, plaintiff saw Sanjay Ghosh, M.D., complaining of back pain radiating into her legs and muscle spasms nightly (Tr. at 200). She reported that her pain was decreased somewhat by her present medication (Amitriptyline, Darvocet, and Ultram). Dr. Ghosh found mild tenderness in the cervical spine and 1+ tenderness in the lumbar spine with muscle spasm. Straight leg raising was negative. She had a nontender thoracic spine, ribs, and pelvis, normal gait and station. "8/18 tender points". Her shoulders were nontender as were her knees, elbows, hips, ankles, MTPs, wrists, MCPs, PIPs and DIPs. She had normal muscle strength and tone. Her mood and affect were normal. Dr. Ghosh assessed "fibromyalgia, better", and low back pain. He continued plaintiff on Darvocet and Ultram.

On June 23, 2003, plaintiff failed to show for her appointment with Dr. Ghosh (Tr. at 200).

On July 29, 2003, plaintiff saw Sanjay Ghosh, M.D. (Tr. at 200). Her chief complaint was fibromyalgia and low back pain.

12

She noted that her pain was decreased by her present medications (Amitriptyline, Darvocet, Ultram, and Flexeril). On exam, plaintiff had 1+ tenderness in the cervical and lumbar spine without muscle spasm. She was nontender in the thoracic spine, ribs, and pelvis. She had normal gait and station. She had 1+ tenderness in the ankles with normal range of motion. She was nontender in the elbows, hips, shoulders, knees, MTPs, wrists, MCPs, PIPs and DIPs. She had normal muscle strength and tone. Her mood and affect were normal. Dr. Ghosh diagnosed fibro-myalgia and continued plaintiff on Darvocet, Flexeril, and Amitriptyline, and he started her on Effexor XR (an anti-depressant).

On August 23, 2003, plaintiff saw Dr. Florante Repaso in the emergency department of Missouri Baptist Hospital (Tr. at 160-166). Plaintiff complained of a toothache. She was diagnosed with a dental abscess and was given Demerol (a narcotic) and Vistaril (treats anxiety and pain) intramuscularly, and then was given another shot of Demerol alone.

On May 24, 2004, plaintiff went to the emergency room at St. John's Mercy Hospital due to a tooth ache (Tr. at 133-134). She reported she had a toothache for about 24 hours, had not been able to get into a dentist, and had not had dental care for many years. Plaintiff saw Alan Dumontier, M.D., who observed numerous cavities, and the "upper posterior molars on the left are rotted

13

down to the gums." Plaintiff was given Demerol and Vistaril intramuscularly. Dr. Dumontier gave plaintiff 10 Percocet (a narcotic) and told her to keep her appointment with her dentist this week.

On May 26, 2004, plaintiff saw Dr. Mohammed Islam in the emergency department at Missouri Baptist Hospital (Tr. at 155-159). She complained of a tooth ache. Plaintiff was given Demerol, Phenergan, and Percocet and told to see her dentist as soon as possible.

On June 15, 2004, plaintiff saw Sanjay Ghosh, M.D., complaining of fibromyalgia and depression (Tr. at 200). Plaintiff had 1+ tenderness in her cervical and lumbar spine without muscle spasm, nontender thoracic spine, ribs and pelvis. She had normal gait and station; nontender elbows, shoulders, knees, hips, ankles, MTPs, wrists, MCPs, PIPs, and DIPs. Plaintiff had 10/18 tender points, normal muscle strength and tone. Plaintiff's mood and affect were normal. Dr. Ghosh assessed fibromyalgia, depression, and leg cramps. He continued plaintiff on Darvocet, Amitriptyline, Ibuprofen, Flexeril, and Ultram, and he started her on Paxil, a selective serotonin reuptake inhibitor used to treat depression. She was told to return in three months.

On September 9, 2004, plaintiff failed to show for an appointment with Sanjay Ghosh, M.D. (Tr. at 201).

14

On September 25, 2004, plaintiff was seen by Dr. Mohammed Islam in the emergency department of Missouri Baptist Hospital (Tr. at 148-154). Plaintiff complained that she fell at work and twisted her ankle three weeks earlier. Plaintiff's musculo-skeletal exam was normal. Plaintiff had x-rays of her right ankle and foot which showed no fracture. Plaintiff was given Vicodin and Motrin.

October 17, 2004, is plaintiff's alleged onset date.

On November 12, 2004, plaintiff saw Sanjay Ghosh, M.D., complaining of snapping at people for no reason, increasing back pain, and fatigue (Tr. at 199, 219). On exam, plaintiff had 1+ tenderness in the cervical and lumbar spine with muscle spasm. Straight leg raising was negative, she had no tenderness in the thoracic spine, ribs, pelvis, elbows, shoulder, knees, hips, ankles, MTPs, wrists, MCPs, PIPs, and DIPs. Her gait and station were normal. She had normal muscle strength and tone. She was alert and oriented times three with normal mood and affect. Dr. Ghosh assessed bilateral sciatic pain, "Does not want MRI evaluation", and fatigue. He ordered blood work.

On December 16, 2004, Sanjay Ghosh, Ph.D., M.D., wrote a letter to whom it may concern which states, "Our patient, Margaret Welch, has Fibromyalgia. She is not to lift anything over 5 pounds." (Tr. at 198). That same day, plaintiff filed her application for disability benefits.

15

On February 9, 2005, plaintiff saw Sanjay Ghosh, M.D., complaining of bilateral sciatic pain, fibromyalgia, and insomnia (Tr. at 219). She reported that her pain was increased by any activity, and was decreased by nothing. On exam, plaintiff had 1+ tenderness in the lumbar spine without muscle spasm, straight leg raising was negative, she had mild tenderness in the cervical spine, nontender thoracic spine, ribs and pelvis, normal gait and station. She had nontender shoulders, knees, elbows, hips, ankles, MTPs, wrists, MCPs, PIPs, and DIPs. She had 10 of 18 tender points, normal muscle strength and tone, and normal mood and affect.

Dr. Ghosh assessed bilateral sciatic pain, fibromyalgia, and insomnia. He prescribed Vicodin ES and noted that plaintiff refused an MRI. He continued her on Flexeril for fibromyalgia, and prescribed Temazepam for insomnia.

On February 16, 2005, plaintiff was seen by Christopher Jackson, D.O., in the emergency room at St. John's Mercy Hospital (Tr. at 234-245). She complained of back pain. "The patient states that she has been having problems with this for about 8 or 9 years, since around 1997. . . . She has had CTs and MRI, and they have all been negative. She has been worked up and seen [by] Dr. Ghosh. She has been to pain management. She has been diagnosed with fibromyalgia. . . . She is unable to work. She is unable to do anything, and so they came in to the emergency

16

department today. There is nothing really new going on. She denies any bowel or bladder incontinence." Plaintiff was smoking a half a pack of cigarettes per day.

Dr. Jackson observed that plaintiff could ambulate without any problem. During his exam he noted a normal gait, full range of motion of the hips, knees, and ankles, no pain on palpation, normal muscle tone and strength. She had good judgment and insight, was oriented to person, place, and time, her recent and remote memory were intact, and she had a flat affect. Plaintiff had x-rays of her lumbar spine which were negative. "We discussed the differential diagnoses and treatments without difficulty, she can be further evaluated as an outpatient. We recommend still seeing Dr. Ghosh. She may need pain management or further evaluation."

Plaintiff was given injections of Morphine and Valium, and she reported that her pain was no better. Dr. Jackson assessed chronic back pain and fibromyalgia, and he prescribed Percocet and Valium. He noted that she may need to see someone in Pain Management.

On February 23, 2005, Dr. Ghosh wrote a letter to whom it may concern which states "Our patient, Ms. Welch, is unable to work for at least one year due to medical reasons." (Tr. at 197).

On March 14, 2005, plaintiff saw Jerry Fitzgerald in the emergency room at Missouri Baptist Hospital of Sullivan (Tr. at

17

249-255). She complained of back pain for the past two days. "Has been painting the bathroom and doing a lot of bending and reaching." Plaintiff said she has a chronic back problem, "but never like this evening - pain down left leg which is new". Plaintiff reported she was smoking one and a half packs of cigarettes per day and that she was a homemaker. All psychiatric factors were normal. Plaintiff was given injections of Toradol (a non-steroidal anti-inflammatory), Demerol (twice) (a narcotic), and Phenergan (for nausea), and she was given Flexeril (a muscle relaxer) orally. Dr. Fitzgerald assessed low back pain and prescribed Flexeril and Naproxen (a non-steroidal anti-inflammatory).

The next day, on March 15, 2005, plaintiff was seen at First Health Urgent Care (Tr. at 223-225). She complained of numbness in her right leg, worse when sitting. She said the symptoms started two days earlier. She reported smoking one pack of cigarettes per day. She was observed to be normal as to psychiatric symptoms, no depression, no anxiety, no difficulty sleeping, no feeling blue. She had normal mood and affect. She reported she had gone to the Sullivan ER last night but was "treated like crap, didn't even get examined". She was assessed with severe low back pain, sciatica. She was given Percocet and Soma (a muscle relaxer). The doctor recommended an MRI and plaintiff said she had a prescription for one. The doctor also

18

recommended a pain management service.

On March 17, 2005, plaintiff saw Jennifer Scheer, M.D., to establish care (Tr. at 207-210). Plaintiff complained of back pain that began five years ago, with marked severity. She reported she had taken Darvocet, Vicodin, Ultram, and Percocet. She said she had been seeing Dr. Ghosh for the past several years. "Apparently his diagnosis was fibromyalgia." Dr. Ghosh did blood work and recommended an MRI but plaintiff had not gotten the MRI due to payment issues. Plaintiff reported she went to the emergency room recently for increased pain and was given Soma and Percocet, which had been somewhat helpful.

Plaintiff also complained of a mood disorder beginning approximately seven months ago. She denied loss of interest in activities, denied difficulty concentrating. Treatments in the past included Paxil which was not effective. Plaintiff claimed that most antidepressants actually make her symptoms worse.

Finally, plaintiff complained of pain. "The patient notes limitation of normal daily activities constantly. Symptoms are aggravated by regular walking." Plaintiff reported smoking one pack of cigarettes per day, drinking a moderate amount of caffeinated beverages daily, and not exercising regularly. During an exam, Dr. Scheer found tender lumbar spinous processes, bilateral lower paraspinal muscle tenderness, severely reduced extension, severely reduced lateral motion bilaterally, severely

19

reduced flexion, severely reduced rotation bilaterally, normal stability, and normal strength and tone, although no range of motion measurements were recorded.  Plaintiff had a decreased affect, was mildly anxious, "very interested in 'fixing my pain'".

Dr. Scheer assessed fibromyalgia and noted that plaintiff reported a bad reaction to Amitriptyline in the past.  She also assessed depression.  "Suggested as much exercise as her back will allow. . .  Strongly recommended counseling.  Given names of some area counselors to contact. . . .  Discussed SSRI's [selective serotonin reuptake inhibitor] versus other medications.  Again, she claims idiosyncratic reactions to most medications but is willing to try Lexapro given its reasonably low risk of side effects."

Dr. Scheer also assessed low back pain, unclear etiology. "She has significantly reduced range of motion and some lower extremity symptoms although her examination today does not suggest the involvement of any one nerve root.  Differential diagnosis includes fibromyalgia versus spinal stenosis versus herniated or degenerative disks.  I recommended beginning our workup with the MRI and by obtaining her records from Dr. Ghosh. I explained that, depending on the exact diagnosis, complete relief of her pain may not be possible.  We discussed the hazards of chronic narcotic and muscle relaxer use.  We will try to

20

control her pain using other means.  She has a few Percocet and Soma left over from the ER visit and will use them sparingly for very severe pain.  I did not prescribe any more narcotics or muscle relaxers today.  She claims to have the opposite reaction to most medications.

On April 15, 2005, plaintiff saw Jennifer Scheer, M.D., for a follow up (Tr. at 204-206).  Plaintiff indicated she was "taking Darvocet from Dr. Ghosh, out of Vicodin."  Plaintiff said her depression had improved somewhat, her feelings of depression had improved, crying episodes had improved, insomnia had improved, anxiety had improved, decreased motivation had improved, and she denied feelings of worthlessness.  She reported that her low back pain had not changed, she continued to have daily pain, worse with walking a lot.  Nothing seems to help, "even the narcotics".  She also complained of fibromyalgia.

On exam of plaintiff's spine, Dr. Scheer found tender lumbar spinous processes, bilateral lower paraspinal muscle tenderness, reduced extension, reduced flexion, reduced lateral motion bilaterally, reduced rotation bilaterally, normal stability, normal strength, and normal tone.  Plaintiff had full range of motion in her extremities, and normal stability, strength and tone.

Dr. Scheer assessed depression and low back pain.  She indicated she would not change plaintiff's medication, she would

21

continue to monitor her for complications.  She noted that the
Trazodone was working well for sleep, that plaintiff indicated
she could put up with dizziness apparently caused by the
Trazodone.  Plaintiff's MRI of her lower back was normal.  "No
evidence of a reversible cause of her pain.  Fibromyalgia likely
involved.  Discussed fact that pain will likely be chronic.  Need
to focus on control/management.  Discussed narcotics not
appropriate for chronic pain.  Add NSAID [non-steroidal anti-
inflammatory]."  She prescribed Etodolac (non-steroidal anti-
inflammatory) and Neurontin (a non-narcotic pain reliever) and
referred plaintiff to David Carpenter, a neurologist.

On May 5, 2005, plaintiff saw Mark Shen, D.O. (Tr. at 212-
213).  Plaintiff complained of a dental abscess (had no dental
appointment scheduled), and leg pain unrelieved with Vicodin.  On
exam, Dr. Shen found plaintiff healthy appearing and in no
distress.  Dr. Shen diagnosed "depression, remains stable" and
low back pain.  "The patient's low back pain has not changed.
Will increase medication dosage.  With current symptoms of
bilateral leg pain and radiation down both legs, would suspect
spinous process impingement.  MRI is negative.  TSH and other lab
work of CBC, CMP normal from Dr. Ghosh.  Would consider ANA, CRP
as next testing. . . .  Patient did not want to pursue lab work
at this time due to cost.  Will see ortho next week.  Would
suggest Rheum as the next direction to proceed."

22

Dr. Shen also diagnosed fibromyalgia. "The patient's myalgia is unchanged. Will not change medication". Finally, he diagnosed diseases of pulp and periapical tissues. "[P]atient really needs to find dentist. This has been a recurring problem." He prescribed Neurontin, Vicodin, and Penicillin.

On June 10, 2005, plaintiff had a CT scan of her lumbar spine at the direction of Dr. Scheer (Tr. at 232). Dr. Lovern found that there were minimal areas of degenerative facet changes and sclerosis of the sacrum, "of uncertain significance." He found that "potentially there could be some normal variant in this patient, as it is relatively symmetric and at multiple levels and therefore other etiologies, such as metastatic disease are thought unlikely."

On June 10, 2005, Jennifer Scheer, M.D., completed a Mental Medical Source Statement (Tr. at 215-218). Dr. Scheer found that plaintiff was not limited at all in her ability to maintain reliability, relate in social situations, interact with the general public, maintain socially acceptable behavior, understand and remember simple instructions, make simple work-related decisions, or sustain an ordinary routine without special supervision.

She found that plaintiff is mildly limited in her ability to function independently, accept instructions and respond to criticism, maintain regular attendance and be punctual, respond

23

to changes in the work setting, and work in coordination with others.

She found that plaintiff is moderately limited in her ability to cope with normal work stress, behave in an emotionally stable manner, and maintain attention and concentration for extended periods.

She found that plaintiff is markedly limited in her ability to complete a normal workday and workweek without interruptions from symptoms, and her ability to perform at a consistent pace without an unreasonable number and length of rest periods.

Dr. Scheer found no extreme limitations. She found that plaintiff has experienced four or more episodes during the last year of decompensation as an exacerbation or temporary increase in symptoms or signs accompanied by a loss of adaptive functioning which lasted at least two weeks. She found that plaintiff does not have a substantial loss of ability to understand, remember, and carry out simple instructions; to make judgments that are commensurate with the functions of unskilled work; or to respond appropriately to supervision, co-workers and usual work situations. She found that plaintiff does have a substantial loss of ability to deal with changes in a routine work setting.

When asked for the date of onset of plaintiff's symptoms, Dr. Scheer wrote, "2001 per patient report. I have only cared

24

for patient since March 2005". Dr. Scheer noted that she has never provided a global assessment of functioning, and that plaintiff's "disability is primarily physical".

On June 13, 2005, plaintiff saw Sanjay Ghosh, M.D. (Tr. at 219). Plaintiff complained of constant moderate pain in her low back, hands, and legs. She said the pain was increased by walking and standing in one place, decreased by nothing. She was smoking a half a pack of cigarettes per day. Plaintiff had 1+ tenderness in the lumbar spine without muscle spasm, negative straight leg raising, nontender cervical spine, nontender thoracic spine, nontender ribs and pelvis. She had normal gait and station. She had mild tenderness without swelling in her wrists, MCPs, PIPs, ankles, and MTPs with normal range of motion. She had nontender elbows, shoulders, knees, hips, PIPs, and DIPs. Her muscle strength and tone were normal, and her mood and affect were normal. Dr. Ghosh assessed polymyalgia rheumatica[6] and bilateral sciatic pain. He prescribed Soma (a muscle relaxer), Darvocet (a narcotic), and Tramadol (non-narcotic pain reliever).

On June 13, 2005, Jennifer Scheer, M.D., completed a Physical Medical Source Statement (Tr. at 227-230). Dr. Scheer indicated she had diagnosed plaintiff with chronic back pain,

---

[6]Polymyalgia rheumatica causes muscle pain and stiffness in the neck, shoulders and hips. It is most common in women and almost always occurs in people over 50. The main symptom of polymyalgia rheumatica is stiffness after resting. Other symptoms include fever, weakness and weight loss.

25

fibromyalgia, and depression. She found that plaintiff could sit for four hours each day, stand for one hour each day, and walk for 30 minutes each day. She found that plaintiff could occasionally lift ten pounds and frequently lift five pounds. She found that plaintiff had no manipulative limitations, no visual limitations, and no communicative limitations. She found that plaintiff is limited in her ability to balance, that she can occasionally reach above her head, and that she can never stoop. She found that plaintiff can have occasional exposure to odors, dust, or noise. Dr. Scheer found that plaintiff's impairments cause the need to lie down or take a nap during the day every 15 to 30 minutes. She also noted that plaintiff suffers from rectal incontinence.

When asked whether in her opinion the limitations assessed in the form have lasted 12 continuous months or can be expected to last 12 continuous months, Dr. Scheer checked "yes" and the wrote, "per patient". When asked for the date of onset of plaintiff's symptoms, Dr. Scheer wrote, "3/17/05 – first time I saw patient. Per patient have existed since 2000".

On October 4, 2005, plaintiff had an MRI of her lumbar spine due to back pain, left leg pain, and radiculopathy since August 2005 (Tr. at 262-265). Dr. Anderson found mild degenerative changes in the lumbar spine. "At least two and possibly three enhancing intradural nodules in the cauda equina. These may

26

represent hematogenous metastatic foci or drop metastases from gliomas in the upper cord or brain. Rarely they may represent inflammatory granulomas. Correlation with contrast enhanced brain, cervical and thoracic MRI is recommended."

On October 11, 2005, plaintiff had an MRI of the brain due to a suggestion of possible drop metastases on a recent MRI dated October 4, 2005 (Tr. at 256-261). Dr. West found no intracranial malignancy. He noted that "[t]here are several subcentimeter T2 hyperintense white matter foci as described involving the left frontal white matter, peritrigonal white matter, right centrum semiovale, right parietal white matter and right cerebellum. Although nonspecific, the primarily diagnostic consideration is a demyelinating process such as multiple sclerosis." That same day plaintiff had an MRI of the cervical spine. Dr. West found no pathologic enhancement, no intradural mass lesion, no abnormal cord signal, congenital [from birth] fusion of the C2-3 vertebral bodies, mild C3-4 central canal stenosis [narrowing] secondary to a posterior disc osteophyte complex [a bony outgrowth] which effaces the ventral CSF space, severe right and mild left C3-4 foraminal stenosis [narrowing] secondary to endplate osteophyte and uncovertebral hypertrophy [increase in bulk, not due to tumor formation], mild right C4-5 foraminal narrowing due to face and uncovertebral hypertrophy, and mild miltilevel facet [a small smooth area on a bone] arthropathy [any disease affecting a

27

joint]. Plaintiff also had an MRI of her thoracic spine. Dr. West observed no focal thoracic cord signal abnormality. The masses observed do not contribute to significant canal stenosis, or narrowing.

**C.** **_SUMMARY OF TESTIMONY_**

During the July 11, 2005 hearing, plaintiff testified as follows:

At the time of the hearing, plaintiff, age 40, was living in a mobile home with her boy friend (Tr. at 275). Plaintiff babysits for her boy friend's nine-year-old daughter who stays with her dad one week on, one week off (Tr. at 276). Plaintiff went to school through eight grade and also received training in restaurant management (Tr. at 275).

Plaintiff received unemployment benefits until May 2005 (Tr. at 277). She looked for work on the computer and in newspapers (Tr. at 277). When asked about the inconsistency in presenting herself ready, willing, and able to work in order to collect unemployment benefits while she was attempting to get Social Security disability benefits due to an inability to perform any job, plaintiff responded, "It was my only source of income. It's all I had at the time." (Tr. at 277).

Plaintiff previously worked as a manager for a fast food restaurant (Tr. at 278). She also worked as an assembler in 2003 and 2004 (Tr. at 278). At that job, she put caps on bottles, put

28

bottles in boxes, fixed labels, and cleaned up (Tr. at 279-280).
She was a bartender in 2001 and 2002 (Tr. at 279).  She left that
job to work as a kitchen manager at Meramec State Park (Tr. at
279).  She worked that job from April 2002 until November 2002
when the park closed for the season (Tr. at 279).  Plaintiff
worked as a waitress from about May 2004 until October 2004 (Tr.
at 279).

Plaintiff is unable to work due to pain in her lower back
and legs, and achiness all over caused by fibromyalgia (Tr. at
280).  When plaintiff testified that Dr. Ghosh and Dr. Scheer
diagnosed the fibromyalgia, the ALJ interrupted and noted that
Dr. Scheer did not diagnose fibromyalgia, rather plaintiff told
Dr. Scheer she had fibromyalgia and the doctor merely wrote that
down in plaintiff's records (Tr. at 280-281).  Plaintiff
responded that "We're ruling out other things and she's coming
down to where she believes also it is the fibromyalgia." (Tr. at
281).  Dr. Ghosh diagnosed fibromyalgia in 2002, and plaintiff
continued to work through 2004 (Tr. at 281).  When asked what
tests Dr. Ghosh performed in order to diagnose fibromyalgia,
plaintiff said, "He didn't do any test because I had no medical
insurance to cover the cost of the test.  It was on the
symptoms." (Tr. at 281).  When asked whether Dr. Ghosh diagnosed
fibromyalgia based on the symptoms plaintiff told him about,
plaintiff responded, "Yes" (Tr. at 281).

Plaintiff's back pain is constant (Tr. at 282). Her medication helps some, and stretching sometimes helps, but on some days nothing helps (Tr. at 282). Any activity makes the pain worse, but especially walking and standing (Tr. at 282). The pain radiates down plaintiff's legs (Tr. at 282). When she can be inactive, her pain is controlled fairly well (Tr. at 282). She can walk a half a block at the most (Tr. at 282).

Plaintiff has achiness everywhere in her body, her shoulders, hands, feet (Tr. at 282). Plaintiff has also started losing control of her bowels and bladder (Tr. at 283). That started about three months ago, and Dr. Scheer is treating plaintiff for these symptoms (Tr. at 283). When asked when Dr. Scheer began treating plaintiff for these symptoms, plaintiff testified as follows:

> Pl:  It's an ongoing process. She's working on one thing at a time. I see her tomorrow.
>
> ALJ:  So it's your testimony that she's not treating you for it?
>
> Pl:  She's not treating me with any medications or anything at this time. I've been working with Dr. Scheer since March, and she is looking at one thing at a time. You know. She wanted to get the legs and the pain and numbness under control.

(Tr. at 283).

Plaintiff also suffers from overwhelming fatigue (Tr. at 283-284). She has episodes where she can do nothing but lie down and sleep, the episodes occur two to three times a month and last

30

from three to eight days (Tr. at 284). Plaintiff spends about four to five hours total lying down during the day (Tr. at 286). She tries to do things like using a feather duster, watering her plants, or drawing (Tr. at 286). Plaintiff makes pizza, microwaveable meals, or crock pot meals (Tr. at 287). She goes to the grocery store once or twice a week (Tr. at 287). It takes her about 20 minutes to do her shopping (Tr. at 287-288). Plaintiff does dishes, which sometimes takes about 20 minutes, but other times she can only wash dishes for five minutes at a time (Tr. at 288). Plaintiff's boy friend does the vacuuming, mopping, sweeping, he takes out the trash and does the laundry (Tr. at 288-289).

Plaintiff usually gets up at 5:00 a.m., makes coffee, and watches the news (Tr. at 289). Sometimes it takes two or three hours before she gets up to take a shower and get dressed (Tr. at 289). Then she sits back down, watches TV or reads, then she does simple household chores like dusting with a feather duster, washing dishes, doing a load of laundry, wiping down the bathroom (Tr. at 289). She takes a nap, reads, works on the computer, draws, and then fixes a simple dinner, relaxes, and then goes to bed (Tr. at 289). She works on her computer for about an hour a day, spends about an hour a day on housework, up to three hours per day drawing (Tr. at 289-290). Plaintiff goes out of her house about two or three times a week, to the grocery store, the

31

bank, to pay a bill, or to visit her boy friend's parents (Tr. at
290).  It takes 25 to 30 minutes to get to her boy friend's
parents' house (Tr. at 290).  Sometimes she stays an hour,
sometimes she spends the day there (Tr. at 290-291).  Plaintiff
and her boy friend go to a restaurant about twice a month, and
she has friends she talks to on the phone (Tr. at 291).

Two or three weeks before the hearing, plaintiff went to
visit a friend who lives by the river (Tr. at 291).  Sometimes
she plays her guitar (Tr. at 292).

Plaintiff cannot sit for more than an hour without needing
to get up and change positions (Tr. at 284).  On a good day, she
can standing for 15 or 20 minutes, but on a bad day she can only
stand for two or three minutes (Tr. at 285).  Plaintiff can walk
up one flight of stairs (Tr. at 285).  She can lift a gallon of
milk but she cannot lift a 24-pack of soda (Tr. at 285).  She can
bend over to pick something up off the floor (Tr. at 285).  If
she crouches or squats, she ends up on her knees and has to use
something to get back up (Tr. at 285-286).  She can reach above
her head (Tr. at 286).

Plaintiff has trouble concentrating because of her
medications (Tr. at 286-287).  She sleeps for about four or five
hours at night (Tr. at 287).  When she has her fatigue episodes,
she sleeps for 12 to 13 hours per day (Tr. at 287).  She takes at
least one nap every day, and sometimes two or three (Tr. at 287).

32

Her naps last from an hour and a half to three or four hours (Tr. at 287).

Plaintiff suffers from anxiety, she is always tense and feels stressed (Tr. at 292). When asked who diagnosed her with anxiety, plaintiff said, "I think they're still thinking it's more depression. Dr. Ghosh and Dr. Scheer." (Tr. at 292). Plaintiff has crying spells once or twice a week (Tr. at 293). She has never been hospitalized for mental treatment, and has not received any treatment, therapy or counseling (Tr. at 293). Plaintiff has had her mental problems for three or four years, but did not seek treatment, therapy, or counseling during all that time because she did not have insurance (Tr. at 294). The ALJ pointed out that plaintiff was able to find money to smoke a pack and a half of cigarettes per day during the time she was unable to afford mental health treatment, and plaintiff responded that smoking is a bad habit (Tr. at 295).

The ALJ pointed out that Dr. Ghosh's records indicate he did not diagnose plaintiff with depression, rather she told him she was depressed (Tr. at 295-296). Plaintiff responded that she never told Dr. Ghosh she was depressed, that he said he thought she was depressed (Tr. at 296). When the ALJ asked about plaintiff's emergency room visit when she said she needed pain medication because she had been painting the bathroom and doing a lot of bending and reaching, plaintiff said that she wasn't

33

painting, she was "helping put the masking tape around the sink and everything in the bathroom.  And I had pinched something in my lower back." (Tr. at 296).

Plaintiff was fired from her job in October 2004 (Tr. at 295).  She alleges she became disabled on October 17, 2004, and she filed for disability benefits on December 16, 2004 (Tr. at 295).  Plaintiff explained that she hid her medical problems from her employer because she figured she would get fired, and she needed to work because she was single (Tr. at 295).  "Between the medication and the anxiety, I did not get along with co-workers, I did not get along with the boss.  I did my job, and I felt I did a good job.  It was the hostility and taking time off because I could not make it to work.  I could not do it.  Or asking to leave early." (Tr. at 295).

## V.  *FINDINGS OF THE ALJ*

On October 13, 2005, Administrative Law Judge J. Pappenfus entered an opinion finding plaintiff not disabled (Tr. at 12-23).

Step one.  The ALJ found that plaintiff has not performed substantial gainful activity since her alleged onset date (Tr. at 14).

Step two.  The ALJ found that plaintiff suffers from fibromyalgia, depression, and back pain, a medically determinable combination of impairments that is severe (Tr. at 14).

34

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 14).

Step four.  The ALJ found that plaintiff retains the residual functional capacity to perform a wide range of light exertional work.  Light exertional work requires a maximum lifting of 20 pounds, frequent lifting of ten pounds, and standing or walking for six hours per day.  Plaintiff is limited to unskilled work (Tr. at 21).

With this residual functional capacity, plaintiff can return to her past relevant work as an assembler, bartender, waitress, or fast food cook/cashier as those jobs are performed in the national economy and as plaintiff performed them (Tr. at 21).

Therefore, plaintiff was found not disabled at the fourth step of the sequential analysis.

## VI.  OPINIONS OF PLAINTIFF'S TREATING PHYSICIANS

Plaintiff argues that the ALJ erred in failing to give controlling weight to plaintiff's treating physicians.  However, plaintiff does not identify which physicians she believes should have been given controlling weight, and argues only that the ALJ substituted her own opinion.

Plaintiff argues at length that she does have fibromyalgia, even though some doctors merely accepted another physician's diagnosis or plaintiff's report.  This argument is irrelevant, as the ALJ found that plaintiff's severe combination of impairments

35

includes fibromyalgia.

I will assume plaintiff is referring to the one-sentence letters sent to whom it may concern by Dr. Ghosh and the medical source statements completed by Dr. Scheer. The ALJ had this to say about these doctors:

The claimant testified at her hearing that Dr. Ghosh, who diagnosed her with fibromyalgia, based this diagnosis on the claimant's reported symptoms only, rather than on testing. Fibromyalgia is a diagnosis of exclusion and is based upon a history of widespread pain and pain in eleven of eighteen specific trigger points on digital palpitation (Official Diagnostic Criteria Developed for Fibromyalgia by the American College of Rheumatology (ACR) in 1990). Thus, it is a subjective diagnosis based upon 1) the claimant's protestations of pain when palpitated [sic], i.e., when poked and prodded, the claimant reports that she hurts, and 2) a diagnosis of exclusion (see Tierney, McPhee, and Papadakis, <u>Current Medical Diagnosis and Treatment</u> (1996 ed.), pp. 733-734). Numerous objective medical tests are performed. Each objective medical test producing a negative/normal result eliminates an impairment that would have produced a positive test result, as a possible cause of the claimant's impairment. Therefore, a diagnosis [of] fibromyalgia requires an examination of eighteen "trigger points" and the elimination of possible impairments based on numerous negative/normal test results.

The February 12, 2003, records from Dr. Ghosh indicate she has 8/18 tender points. On June 15, 2004, she had 10/18 tender points. At both examinations, she had normal muscle strength and tone. Given the absence of any notations regarding how Dr. Ghosh concluded that the claimant had fibromyalgia, I find that the evidence of record does not support his medical conclusions. As noted throughout the body of the decision, the claimant's inconsistent statements regarding her symptamalogies [sic] and functional limitations cast further doubt on Dr. Ghosh's diagnosis of fibromyalgia.

On December 4, 2004, Dr. Ghosh stated that the claimant's fibromyalgia limited the claimant's lifting to no more than five pounds. However, Dr. Ghosh's statements are very conclusory, based on contradicted information provided by

36

the claimant, and do not correlate with the claimant's longitudinal history. These are limited findings with no medical support for the weight restrictions and they are contradictory with Dr. Ghosh's clinical findings. Although I will give Dr. Ghosh's opinion appropriate weight in structuring the claimant's residual functional capacity, I will not afford it controlling weight, because it is based on incomplete and incorrect information provided by the claimant and the claimant's subjective complaints. In addition, it is inconsistent with other reliable evidence in the longitudinal record.

On June 13, 2005, Jennifer Scheer, M.D., completed a medical source statement for the claimant at the behest of the claimant's attorney. She indicated that she first saw the claimant on March 17, 2005. Dr. Scheer accepted Dr. Ghosh's diagnoses that the claimant had fibromyalgia, rather than on any examination of her tender points. . . . She indicated that the claimant had been diagnosed with chronic back pain, irritable bowel syndrome, and depression. She stated that the claimant could sit four hour out of an eight-hour day, stand one hour out of an eight-hour day, and walk 30 minutes out of an eight-hour day. Dr. Scheer also stated that the claimant could only occasionally lift and carry up to 10 pounds, and she would need to take breaks every 15 to 30 minutes to alleviate her pain during a normal eight-hour workday.

Many factors dilute the probative value of Dr. Sheer's [sic] opinion. While Dr. Sheer [sic] does have a treating relationship with the claimant, the treatment history is quite brief. She began seeing the claimant in March of 2005, and Dr. Sheer [sic] completed the functional assessment on June 13, 20005 [sic]. Furthermore, her opinion of the claimant's limitations offers no medical support for the weight restrictions. Although I will give Dr. Sheer's [sic] opinions appropriate weight in structuring the claimant's residual functional capacity, I will not afford them controlling weight, because it, much like Dr. Ghosh's opinion, is based on incomplete and incorrect information provided by the claimant and the claimant's subjective complaints. In addition, it is also inconsistent with other reliable evidence in the longitudinal record.

(Tr. at 17-19).

37

A treating physician's opinion is granted controlling weight
when the opinion is not inconsistent with other substantial
evidence in the record and the opinion is well supported by
medically acceptable clinical and laboratory diagnostic
techniques.  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005);
Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005).  If the ALJ
fails to give controlling weight to the opinion of the treating
physician, then the ALJ must consider several factors to
determine how much weight to give to the opinion of the treating
physician:  (1) the length of the treatment relationship, (2)
frequency of examinations, (3) nature and extent of the treatment
relationship, (4) supportability by medical signs and laboratory
findings, (5) consistency of the opinion with the record as a
whole, and (6) specialization of the doctor.  20 C.F.R. §
404.1527(d)(2) - (5).

**Sanjay Ghosh, M.D.**

*Length of the treatment relationship.*

This factor is not an issue.  Plaintiff first saw Dr. Ghosh
on July 17, 2002, and last saw Dr. Ghosh on June 13, 2005, a
treatment relationship of almost three years.

*Frequency of examinations.*

Plaintiff saw Dr. Ghosh a total of nine times during that
three years.  She failed to show up for appointments with Dr.

38

Ghosh four times.  She saw Dr. Ghosh three times after her
alleged onset date.  This is not a determining factor either way.
*Nature and extent of the treatment relationship*.

Dr. Ghosh was treating plaintiff for fibromyalgia, which is
one of her alleged impairments.
*Supportability by medical signs and laboratory findings*.

This factor is very troublesome and supports the ALJ's
decision to discredit Dr. Ghosh's two very brief letters.  The
first time plaintiff saw Dr. Ghosh, on July 17, 2002, she
complained of numbness in her right leg and left hip, and she
said she experienced morning stiffness for one to two hours.
Yet, in his record, he marked "No" for numbness and "No" for
morning stiffness, among other things.  Therefore, his first
medical record contains internal inconsistencies.  About a month
later, plaintiff returned complaining of increased back pain,
despite the Ultram she had been prescribed, and decreased sleep.
Dr. Ghosh recommended an MRI, and plaintiff refused.  There is no
evidence that he performed a physical exam on this visit, and
there is no record of what "decreased sleep" means, i.e., it is
possible plaintiff had been sleeping 16 hours per day and now was
sleeping only 12.  Despite that obvious lack of information, Dr.
Ghosh prescribed Amitriptyline which treats insomnia.

A month later, on September 26, 2002, plaintiff saw Dr.
Ghosh who noted 14/18 tender points and, for the first time,

diagnosed fibromyalgia. There is no record of any other testing having been done. Dr. Ghosh told plaintiff to continue taking Amitriptyline, and he referred her to a neurologist, although there is no evidence that plaintiff ever saw a neurologist. Therefore, at this point in his treatment of plaintiff, Dr. Ghosh had recommended an MRI and plaintiff had refused, and he had recommended she see a neurologist, which she did not do.

Plaintiff did not see Dr. Ghosh again until about five months later, on February 12, 2003. On that visit, she reported that her pain was decreased by her present medication, which included the narcotic Darvocet and Flexeril, a muscle relaxer. Dr. Ghosh had not prescribed Darvocet or Flexeril, rather plaintiff had gotten those prescription from one of her many emergency room visits. Dr. Ghosh found only 8/18 tender points, and he assessed "fibromyalgia, better". Dr. Ghosh continued plaintiff on the Darvocet that had been prescribed in the ER. It is noteworthy that the Darvocet had been prescribed eight days earlier for alleged hand pain, and not for any of the symptoms plaintiff was complaining about to Dr. Ghosh.

Five months later, plaintiff returned to see Dr. Ghosh and again reported that her pain was decreased by her present medications. Although he noted no tender points, and on exam plaintiff was nontender in the thoracic spine, ribs, pelvis, elbows, hips, shoulders, knees, all finger joints and all toe

40

joints, Dr. Ghosh assessed fibromyalgia.  Also on this visit, even though plaintiff had not complained of any depression and Dr. Ghosh noted her mood and affect were normal, he started her on an antidepressant.  Although antidepressants are sometimes used to treat fibromyalgia, the only indication that plaintiff had fibromyalgia during this visit was her complaint of "fibromyalgia".

Plaintiff did not see Dr. Ghosh again for 11 months.  On this next visit on June 15, 2004, she complained of fibromyalgia and depression.  Although Dr. Ghosh observed that plaintiff's mood and affect were normal, he prescribed Paxil.  Furthermore, although plaintiff had no muscle spasm and was nontender in her thoracic spine, ribs, pelvis, elbows, shoulders, knees, hips, ankles, finger joints, and toe joints, and she had only 10/18 tender points, he again assessed fibromyalgia.  Curiously, Dr. Ghosh also assessed leg cramps, although plaintiff did not complain of leg cramps and nothing in Dr. Ghosh's notes indicate that he observed anything related to leg cramps.

Five months later, plaintiff returned to see Dr. Ghosh, and this was a month after she had been fired from her job and a month before she applied for disability.  On this visit, Dr. Ghosh assessed bilateral sciatic pain, but not fibromyalgia.  He recommended an MRI, but noted that plaintiff "does not want MRI evaluation."  At this point in her treatment by Dr. Ghosh,

41

plaintiff had refused an MRI multiple times, had failed to see a neurologist as directed, had failed to show up for four different appointments with Dr. Ghosh, and had done nothing other than collect more and more prescriptions.

After those seven visits over the previous two and a half years, plaintiff apparently requested that Dr. Ghosh write a letter "to whom it may concern" in December 2004. His one-line letter simply states that plaintiff has fibromyalgia and is not to lift anything over five pounds. There is not one lifting restriction in any of Dr. Ghosh's records. In fact, there is not even a complaint by plaintiff that lifting in any way exacerbates her symptoms. The last medical visit, about a month before this letter was written, reflects that plaintiff was nontender in her elbows, shoulders, wrists and fingers; she had normal muscle strength and tone; and she was assessed only with bilateral sciatic pain, which is not at all related to the arms or shoulders, nor would it affect plaintiff's ability to lift.

Plaintiff saw Dr. Ghosh one more time after this letter and before the second letter was written. On February 9, 2005, plaintiff saw Dr. Ghosh complaining of bilateral sciatic pain, fibromyalgia, and insomnia. She reported for the first time that her pain was increased by any activity and decreased by nothing, coincidentally, the same questions asked on the disability application forms plaintiff completed a month and a half earlier.

42

Dr. Ghosh noted 10/18 tender points, but assessed fibromyalgia. He also assessed insomnia again without any inquiry as to how much plaintiff was sleeping or what her sleeping problems were. Once again plaintiff refused to get an MRI.

Later that month, Dr. Ghosh wrote the second letter to whom it may concern stating that plaintiff is unable to work for at least one year "due to medical reasons." Dr. Ghosh did not even indicate what medical reasons precluded plaintiff's working.

An ALJ is not required to justify a decision to give little weight to a physician's opinion that a patient is disabled or unable to work, because such decisions are reserved for the Commissioner. Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). An ALJ need not give special weight to treating physicians' opinions if they have no special significance. Among the opinions by treating doctors that have no special significance are determinations that an applicant is "disabled" or "unable to work." 20 C.F.R. § 404.1527(e)(1). These determinations are legal conclusions that the regulation describes as reserved to the Commissioner. Ellis v. Barnhart, 392 F.3d at 994.

Therefore, the only opinion by Dr. Ghosh that the ALJ was required to consider is the opinion that she can lift no more than five pounds, and as discussed above, that opinion is not supported at all by Dr. Ghosh's own medical records, or by any

43

medical signs or laboratory findings.  In fact, it is
inconsistent even with plaintiff's testimony that she is able to
lift a gallon of milk, which weighs approximately eight pounds.
*Consistency of the opinion with the record as a whole.*

This is another very troubling factor, as Dr. Ghosh's
opinion that plaintiff cannot lift more than five pounds is not
supported by any of the other medical records in the file.

Four and a half years before Dr. Ghosh's letter to whom it
may concern, plaintiff saw Dr. Ratcliff in the emergency room
after she fell at work and hit her left arm and shoulder.  X-rays
showed there was no fracture or dislocation.  Plaintiff was
assessed with left shoulder contusion and sprain, was given a
sling, and was told not to use her left arm at work for three
days.

The next relevant complaint came on March 22, 2001, when
plaintiff went to the emergency room complaining of left shoulder
pain.  That was when she tried to get a Frisbee off her roof and
fell through an awning.  At that time, plaintiff was only in mild
pain.  Her shoulder x-ray was normal.  She was again assessed
with shoulder strain and was told to use a sling.

On February 4, 2003, plaintiff went to the emergency room
complaining of left hand pain.  She was offered Ibuprofen and
said, "I've got that" and was then given a prescription for
Darvocet, a narcotic.  The doctor put on a splint.  Plaintiff saw

44

Dr. Ghosh just eight days later and failed to mention any hand pain; therefore, it is reasonable to assume it had resolved.

There are no other complaints or findings in any medical record dealing with plaintiff's arms, hands, shoulders, or her ability to lift.  Plaintiff never alleged that lifting exacerbated any pain, including back pain or leg pain.  In fact, plaintiff testified that she can lift a gallon of milk, which weighs about eight pounds -- almost twice the weight restriction set by Dr. Ghosh in his letter.  Those facts, along with the fact that plaintiff applied for disability benefits the same day Dr. Ghosh wrote the letter, and the fact that plaintiff did not actually have a doctor's appointment with Dr. Ghosh that day, suggest that Dr. Ghosh simply wrote what plaintiff asked him to write in connection with her disability application.  The lifting restriction he stated in the letter simply has no basis in his records or in any other record in the file, and is contradicted by plaintiff's own testimony.

*Specialization of the doctor.*

It appears that Dr. Ghosh is a general practitioner, although this factor is really of very little importance considering the previous two.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision to

45

discredit the letters to whom it may concern written by Dr. Ghosh.

**Jennifer Scheer, M.D.**

Dr. Scheer completed a medical source statement physical and a medical source statement mental which are the subject of plaintiff's allegation of error by the ALJ.  The ALJ gave very little weight to those opinions.

*The length of the treatment relationship.*

As noted by the ALJ, plaintiff first saw Dr. Scheer to establish care on March 17, 2005, and Dr. Scheer completed the medical source statements on June 10, 2005 -- less than three months later.  In addition, plaintiff's treatment relationship with Dr. Scheer began two weeks after she requested a hearing on her disability case (Tr. at 35) leading one to suspect that plaintiff's complaints to Dr. Scheer were exaggerated.[7]

*Frequency of examinations.*

Again as noted by the ALJ, plaintiff saw Dr. Scheer only two times before the medical source statements were completed.  This is hardly enough to establish the difference which justifies giving controlling weight to a treating physician.

---

[7]Plaintiff's credibility will be discussed more at length below.

46

*Nature and extent of the treatment relationship.*

Plaintiff saw Dr. Scheer two times, both between the time she requested a hearing on her disability case and when Dr. Scheer completed the medical source statements.  During the second visit, Dr. Scheer told plaintiff she needed to get off the narcotics and muscle relaxers and find another way to deal with her pain.  Dr. Scheer also recommended that plaintiff exercise as much as possible and that she seek counseling.  Dr. Scheer even provided names of counselors for plaintiff.  Plaintiff had never taken the advice of other doctors to participate in counseling, and she continued to go from one ER doctor to another obtaining prescriptions for narcotics and muscle relaxers.  Therefore, Dr. Scheer's advice appears to contradict plaintiff's previous medical goals.  Finally, although medical records were provided through mid October of 2005, no other records of visits with Dr. Scheer were provided after the medical source statements were prepared, again suggesting that plaintiff's visits with Dr. Scheer were motivated by her desire to further her disability application.

*Supportability by medical signs and laboratory findings.*

This factor is easily analyzed by reading the medical source statements themselves.  In the medical source statement mental, Dr. Scheer noted that her answers were "per patient, I have only cared for patient since 3/05", or three months earlier.  She also

47

noted on this mental assessment form that plaintiff's disability is "primarily physical" and that she had never assessed plaintiff's global assessment of functioning.

Dr. Scheer found that plaintiff was markedly impaired in her ability to complete a normal workday and workweek without interruptions from symptoms. The only thing in her records to support such a finding is plaintiff's allegation that she is limited in normal daily activities constantly. She found that plaintiff was markedly impaired in her ability to perform at a consistent pace without an unreasonable number and length of rest periods; however, there is no indication that plaintiff even alleged that she needed to rest frequently. Plaintiff complained on the second visit with Dr. Scheer that her pain was worse when she walked a lot, and this was after plaintiff was told to exercise as much as her back would allow. In addition, Dr. Scheer's finding that plaintiff has suffered from four or more episodes of decompensation lasting at least two weeks over the previous year is called into serious doubt by her caveat at the bottom of that page that the findings are "per patient. I have only cared for patient since 3/05".

There simply is nothing in Dr. Scheer's own medical records to support these findings, and Dr. Scheer was careful to limit her findings by pointing out that they were "per patient".

Case 2:06-cv-04227-REL   Document 24   Filed 09/06/07   Page 48 of 59

The same can be said of Dr. Scheer's medical source statement medical. She found that plaintiff can only sit, stand, and walk for a total of five and a half hours per day, and that she needs to take a break every 15 to 30 minutes to alleviate pain. Again, she ended the form with a notation that she had only seen plaintiff since March 17, 2005, and that at least some of her answers were "per patient".

Dr. Scheer noted in her records that plaintiff's MRI of her back was normal, and she was unable to find a reversible cause for plaintiff's pain. Plaintiff had full range of motion in her extremities, she had normal strength and tone. Just three days before plaintiff told Dr. Scheer that she suffered limitation of normal daily activities constantly, she told another doctor that she had been painting her bathroom and doing a lot of bending and reaching, leading to the conclusion that plaintiff's allegations to Dr. Scheer were exaggerated.

Based on the above, the ALJ was correct in her assessment that Dr. Scheer's medical source statements are not supported by medical signs and laboratory findings.

*Consistency of the opinion with the record as a whole.*

Again, Dr. Scheer's assessments in the medical source statements are not supported by the record as a whole. In the four days before plaintiff first saw Dr. Scheer, she went to the emergency room at Missouri Baptist Hospital and said she had been

49

painting her bathroom and doing a lot of bending and reaching and hurt her back. She claimed she had a chronic back problem, but "never like this evening - pain down left leg which is new". The record shows that plaintiff had been complaining of pain going down her left leg for years, there was nothing new about that. Plaintiff was given injections of narcotics multiple times, in addition to other medications. She was then prescribed only a muscle relaxer and a non-steroidal anti-inflammatory. Although the records from Missouri Baptist Hospital show that plaintiff was there for several hours, she was examined by a doctor, she was given injections over a multi-hour period, and she was given prescriptions upon discharge, she went to an urgent care center the next day where she told the doctor there that she had gone to the ER at Missouri Baptist Hospital the day before and was "treated like crap, didn't even get examined." The urgent care doctor recommended an MRI, and plaintiff indicated she had a prescription for one -- no doubt the MRI she had been refusing to get for years when told to by Dr. Ghosh. Plaintiff left the urgent care center with a prescription for narcotics. Plaintiff was also told to go to a pain management service, but there is no evidence she ever did that.

There is no evidence in any other medical record since plaintiff's alleged onset date wherein she complained of an inability to walk, sit, or stand for more than five and a half

hours total per day, or that she alleged or was told to rest every 15 to 30 minutes. During that time, plaintiff had negative straight leg raising, no tenderness in the thoracic spine, ribs, pelvis, elbows, shoulders, knees, hips, ankles, wrists, fingers, or toes. She could ambulate without any problem, had normal gait, normal station, normal muscle strength, and normal muscle tone. She had full range of motion in her hips, knees, and ankles. X-rays of her lumbar spine were normal. She was oriented times three with normal mood and affect, had good judgment and insight, had normal recent and remote memory. She had no depression, no anxiety, no difficulty sleeping, no feeling blue. On February 16, 2005, plaintiff denied bowel incontinence, yet Dr. Scheer assessed rectal incontinence in plaintiff's medical source statement.

All of the records up to the time of Dr. Scheer's medical source statements contradict the assessments in those medical source statements. Therefore, this factor strongly supports the ALJ's decision to give very little weight to those assessments. *Specialization of the doctor.*

Again, it is unclear as to whether Dr. Scheer is a specialist of any kind. However, given the very short treatment relationship and the lack of any medical support for the medical source statements, this factor is not that important.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision to discredit the medical source statements prepared by Dr. Scheer.

## VII. RESIDUAL FUNCTIONAL CAPACITY

Plaintiff next argues that the ALJ erred in determining plaintiff's residual functional capacity because her RFC is not based on any medical evidence. Specifically, plaintiff points out that the ALJ referred to an opinion by a DDS doctor when there is no opinion in the record by a DDS doctor.

The ALJ provided a lengthy opinion outlining the medical evidence, plaintiff's testimony, the analysis of plaintiff's credibility, and the analysis of the opinions of two of plaintiff's treating physicians. She then assessed plaintiff's residual functional capacity based on all of the evidence that she found credible.

Because plaintiff retained the residual functional capacity to perform her past relevant work, the burden of production never shifted to the Commissioner to produce evidence of jobs in the national economy that could be performed by a person with plaintiff's residual functional capacity and vocational skills. Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995). Plaintiff's residual functional capacity, as determined by the ALJ, included the ability to lift 20 pounds occasionally and ten pounds

52

frequently, and stand or walk for six hours per day.  The evidence supports this finding.

On April 28, 2000, x-rays of plaintiff's shoulder were normal.  On November 20, 2000, an MRI of her lumbar spine was normal.  On March 22, 2001, x-rays of her shoulder were normal. On December 30, 2002, x-rays of plaintiff's left hip were normal, and she had a lumbar spine series, all normal.  On September 25, 2004, x-rays of plaintiff's right ankle and foot were normal.  On February 16, 2005, x-rays of plaintiff's lumbar spine were negative.  She had no tenderness in her cervical spine, thoracic spine, ribs, pelvis, shoulders, elbows, hips, ankles, wrists, fingers, or toes.  Straight leg raising was consistently negative.  She had normal muscle strength and tone on every exam. She had normal range of motion in her extremities regularly.

Plaintiff was observed to ambulate without difficulty on August 6, 2000, and on February 16, 2005.  She had normal gait and station on July 17, 2002; February 12, 2003; July 29, 2003; June 15, 2004; November 12, 2004; February 9, 2005; and February 16, 2005.  Plaintiff's mood and affect were normal on December 29, 2002; February 12, 2003; July 29, 2003; June 15, 2004; November 12, 2004; February 9, 2005; March 14, 2005; and March 15, 2005.

The medical records support no more limitation than that assessed by the ALJ.

53

In addition, plaintiff's alleged limitations are not credible. She consistently failed to comply with treatment recommendations, she was not truthful in some of her allegations, she has demonstrated a preference for emergency room treatment where she sees many different doctors who do not have the benefit of her treatment files, and she performs activities which are inconsistent with disability.

*Noncompliance*

Despite acknowledging that physical therapy was helping her tolerate work longer, in 1998 plaintiff stopped going and stopped calling. Even on her second round of physical therapy, plaintiff showed up only for the initial evaluation. Back in 2000, plaintiff was told to stop smoking; however, the record indicates that she continued to smoke heavily throughout the entirety of this record. On August 29, 2002, Dr. Ghosh recommended an MRI of plaintiff's lumbar spine, but she refused to go. The following month, he referred her to a neurologist, but there is no evidence she ever saw a neurologist. On May 24, 2004, plaintiff was told by an ER doctor to "keep her appointment with her dentist this week", but it is clear plaintiff never had an appointment with a dentist and never saw a dentist during the years covered by this file. On May 26, 2004, plaintiff went to the ER again about her teeth, was given narcotics, and was told to see her dentist as soon as possible. Again, plaintiff never went to see a dentist.

54

On November 12, 2004, Dr. Ghosh again told plaintiff she needed an MRI but his notes state, "Does not want MRI evaluation". On February 9, 2005, Dr. Ghosh again recommended an MRI, but plaintiff refused. Plaintiff was told by several emergency room doctors in 2005 that she should seek treatment from a pain management service; however, there is no evidence she ever did that. On March 17, 2005, plaintiff told Dr. Scheer she had been told to get an MRI but she could not afford one. Yet for years plaintiff had chosen to spend her money on cigarettes to support her heavy smoking habit and had for years ignored her doctors' advice to get an MRI. Dr. Scheer told plaintiff to get as much exercise as possible, yet plaintiff always reported no regular exercise to her doctors. Dr. Scheer strongly recommended counseling and provided names of local counselors to plaintiff; however, there is no evidence that plaintiff ever participated in counseling. In fact, plaintiff admitted at her hearing that she had never sought counseling. Dr. Scheer referred plaintiff to David Carpenter, a neurologist, but again there is no evidence that plaintiff ever saw Dr. Carpenter. On May 5, 2005, Dr. Shen recommended blood work, but plaintiff indicated she did not want to pursue lab work. Dr. Shen told plaintiff she needed to find a dentist, but there is no evidence that plaintiff ever visited a dentist.

*Inconsistencies*

Plaintiff complained of pain radiating into both legs on July 17, 2002; August 29, 2002; and February 12, 2003; yet on March 14, 2005, she told an emergency room doctor that she had never experienced pain going down her left leg.

On February 16, 2005, plaintiff told Dr. Jackson in the emergency room that she had been to pain management; however, there is no evidence that ever occurred.

On February 16, 2005, plaintiff denied any bowel or bladder incontinence, yet a few months later when Dr. Scheer completed the medical source statements for plaintiff's disability case, she noted that plaintiff suffered from bowel incontinence. This was based entirely on plaintiff's allegations.

Plaintiff told an urgent care doctor that she had gone to the emergency room the day before but had not even been examined, when the ER records show that plaintiff was indeed examined, she was there for hours, she was given a series of narcotic injections over a several-hour period and was discharged with only non-narcotic prescriptions. The fact that plaintiff left the urgent care center with narcotic prescriptions leads one to suspect that plaintiff is gearing her allegations toward obtaining narcotics.

Plaintiff told Dr. Scheer that she had a bad reaction to Amitriptyline in the past; however, Dr. Ghosh's records show that

56

he routinely prescribed this medication.  Plaintiff never alleged
to any other doctor that she had any problems with Amitriptyline.

Plaintiff admitted that she left all of her jobs for reasons
other than disability.  Plaintiff was fired from her last job
which ended simultaneously with her alleged onset date of
disability.

Finally, plaintiff admitted that she received unemployment
benefits from October 2004 through May 2005, even though she
claimed to be disabled during that time.  Her explanation was
basically that she needed the money.  The same can certainly be
said for her application for disability benefits.  It appears
that plaintiff's applications for government benefits are based
on her desire to have the money rather than on the real reason
those benefits were created.

*Preference for ER doctors*

The record shows that plaintiff has a clear preference for
emergency room treatment as opposed to being treated by the same
doctor.  This record establishes that plaintiff was seen in an
emergency room 15 times and had appointments with her treating
doctors only 11 times during that same time period.  Plaintiff's
emergency room visits resulted in the following medications being
given:

```
04/28/2000      Tylenol 3 (narcotic)
08/06/2000      Morphine (narcotic)
                Vicodin ES (narcotic)
                Flexeril (muscle relaxer)
```

57

```
08/08/2000      Morphine (narcotic)
                Vicodin (narcotic)
03/22/2001      Vicodin (narcotic)
04/17/2002      Vicodin (narcotic)
05/22/2002      Tylenol 3 (narcotic)
                Demerol (narcotic)
12/29/2002      Percocet (narcotic)
                Flexeril (muscle relaxer)
02/04/2003      Darvocet (narcotic)
08/23/2003      Demerol (narcotic) (two shots)
05/24/2004      Demerol (narcotic)
                Percocet (narcotic)
05/26/2004      Demerol (narcotic)
                Percocet (narcotic)
09/25/2004      Vicodin (narcotic)
02/16/2005      Morphine (narcotic)
03/14/2005      Demerol (narcotic) (two shots)
                Flexeril (muscle relaxer)
03/15/2005      Percocet (narcotic)
                Soma (muscle relaxer)
```

Not one time did plaintiff go to an emergency room and not receive narcotic drugs. On one occasion, an ER doctor tried to give her Ibuprofen, and plaintiff said "I've got that" and she walked away with a narcotic instead.

*Abilities*

Finally, plaintiff's daily abilities are inconsistent with complete disability. Plaintiff alleged back pain and leg pain for years, despite working during that time, and she admitted that she was able to work after having been diagnosed with fibromyalgia. Plaintiff babysits for her boy friend's nine-year-old daughter on a regular basis. She was able to do a lot of bending and reaching while painting a bathroom. She claimed that her boy friend does the laundry, but when describing an average day she stated that she does laundry. Plaintiff testified that

58

she can reach over her head even though Dr. Scheer assessed a limited ability to reach overhead.

The ALJ properly found plaintiff's allegations not credible, and the ALJ assessed plaintiff's residual functional capacity on the credible evidence in the record. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff can perform light work and therefore can return to her past relevant work.

## VIII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 5, 2007